UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHRISTINE PALAGHE,

                          CASE NO. 15-11920

      *Plaintiff*,             MAGISTRATE JUDGE PATRICIA T. MORRIS

*v.*

COMMISSIONER OF SOCIAL SECURITY,

      *Defendant.*

_____/

### MAGISTRATE JUDGE'S OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 12, 13)

    **A.**    **Introduction and Procedural History**

    This is an action for judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Christine Palaghe's ("Palaghe") claim for disability benefits under the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. § 401 et seq. (Doc. 1; Tr. 1-3, 175). The case is before the undersigned magistrate judge pursuant to the parties' consent under 28 U.S.C. § 636(c), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference. (Docs. 15, 16, 17). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 12, 13).

    Palaghe was forty-nine years old as of January 11, 2012, her date of alleged disability. (Tr. 36, 175). Her application for benefits was initially denied on June 24, 2013. (Tr. 86-101). Palaghe requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Mara-Louise Anzalone on December 2, 2014. (Tr. 67-85). Palaghe, represented by non-attorney representative Dannelly Smith, testified, as

did vocational expert ("VE") Michelle Ross. (*Id.*). On December 22, 2014, the ALJ issued a written decision in which she found Palaghe not disabled. (Tr. 34-51). On May 4, 2015, the Appeals Council denied review. (Tr. 1-4). Palaghe filed for judicial review of that final decision on May 28, 2015. (Doc. 1).

### B.   Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and

even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal

citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'"

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The

Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

3

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Palaghe not disabled under the Act. (Tr. 51). The ALJ found at Step One that Palaghe had not engaged in substantial gainful activity following the alleged onset date, January 11, 2012. (Tr. 36). At Step Two, the ALJ concluded that Palaghe had the following severe impairments: "a spine disorder, fibromyalgia, chronic pain syndrome, affective disorders, and anxiety disorders." (Tr. 36-38). At Step Three, the ALJ found that Palaghe's combination of

4

impairments did not meet or equal one of the listed impairments. (Tr. 38-40). The ALJ
then found that Palaghe had the residual functional capacity ("RFC") to perform light
work,

> except the claimant can frequently balance and occasionally crawl, crouch,
> kneel, stoop, and climb ladders, scaffolds, ramps, and stairs. She is limited
> to performing simple, routine, and repetitive tasks but not at a production
> rate pace. The claimant can occasionally interact with the public. In terms
> of dealing with changes in the work setting, she is limited to simple work-
> related matters.

(Tr. 40-50). At Step Four, the ALJ found that Palaghe was unable to return to her past
relevant work as a medical biller and medical receptionist. (Tr. 50). At Step Five, the ALJ
found that Palaghe could still perform jobs which exist in significant numbers in the
national economy, and was thus not disabled. (Tr. 50-51).

### E.    Administrative Record

#### 1.    Scope of the Court's Medical Evidence Review

Summarizing medical evidence by definition requires that some portions of
records be left out so that others may be highlighted. This task is particularly important
where, as here, the claimant presents with a voluminous medical record, but asserts
claims of error only as to a limited range of conditions. In this case, Palaghe asserts that
the ALJ erred by 1) incorrectly finding that she did not meet Listing 1.04A, and 2)
rendered an incorrect finding on her credibility as to her assertion of disabling pain. (Doc.
12 at 15-20). Because, as discussed below, Palaghe has waived any claim relating to

5

mental health, the Court will focus its analysis on her medical records relating to her spinal ailments.

### 2. Palaghe's Medical Evidence

In December 2011 Palaghe underwent an MRI to determine the cause of her lumbar spine pain. (Tr. 266). Mild degenerative changes were seen, along with a bulging annuli at L2 through L5 without compression, fracture, or subluxation, and with the conus medularis at normal level. (Tr. 266). She had a laterally herniated nucleus pulposus. (*Id*.).

Also in December 2011 Palaghe treated with a pain clinic, which found that her pain ranged between seven and ten out of ten, and that her pain was too severe for management through physical therapy. (Tr. 429). The pain was somewhat ameliorated by medications, ice, and heat. (*Id*.). She was diagnosed with chronic low back pain with bilateral lower extremity pain resulting from herniated nuclear pulposes at L4-L5, with moderate to severe bilateral L5-S1 facet hypertrophic changes and what appeared to be a bilateral S1 radicular pattern. (Tr. 431).

In March 2012 Palaghe presented with back pain of unknown provenance, which was severe and was rated at eight out of ten. (Tr. 252). She received an epidural steroid injection later that month. (Tr. 259). She received a subsequent injection in April 2012. (Tr. 261). Also in March 2012, Dr. Lakshmana Madala found that Palaghe had eight out of ten back pain radiating into the lower extremities, which had lasted for two to three months, that she reported eight out of ten pain, along with positive straight leg raise, and

a moderate amount of paraspinal tenderness with lumbar flexion and extension. (Tr. 267). She received two injections which provided no relief. (*Id*.). Dr. E. Malcolm Field noted that Palaghe's pain was more likely due to facet joint disease than degenerative disc disease. (Tr. 281). At that time, Palaghe had not lost sphincter control, and did not suffer from floppy foot, buckling knee, or aggravation with coughing and sneezing. (*Id*.). Likewise, she was not limited in terms of walking or loss of her motor, sensory, or reflex abilities, but suffered severe pain on extension of the spine beyond ten degrees. (*Id*.).

In May 2012 Palaghe treated with a licensed practical nurse who noted that Palaghe's back injuries were not attributable to any particular trauma, and mused as to whether she may have sustained childhood abuse or an athletic injury. (Tr. 269). Palaghe was at that time "miserable and pain medication [was] not working." (*Id*.). She had no cervical or thoracic spinous tenderness. (Tr. 272). Straight leg raise was negative, and her legs had normal strength. (*Id*.). Palaghe could walk on heel and toe, and her reflexes were normal in the knees, angle, biceps, and triceps. (*Id*.).

In June 2012 Palaghe had significant back stiffness and tightness, but without significant leg pain. (Tr. 280). She inquired about the possibility of surgery, but Dr. Field found that surgery was not appropriate at that time based on her age. (*Id*.). Nevertheless, Dr. Field noted that Palaghe had "really very significant facet joint arthropathy, at least 2 levels and possibly 3, which would mean that she probably would have to have a spinal fusion." (*Id*.).

Palaghe's left and right legs had strength reduced to three out of five at a June 2012 physical therapy session. (Tr. 287). In June 2012 it was found that she had "good response" to physical therapy. (Tr. 294). Later that month it was noted that Palaghe was not compliant with her treatment due to personal issues, and had repeatedly cancelled her treatment sessions. (Tr. 295).

In August 2012 Dr. Paul LeClair began seeing Palaghe following her discharge from her primary care physician's office for unstated reasons. (Tr. 343). At that point she had been out of work for some eight months, and was using Norco for pain treatment, though she found it to not be "tremendously effective." (*Id*.). Straight leg raise was negative bilaterally, and she had diffuse myofascial tenderness over the middle and low back. (Tr. 344). She had some weakness in the proximal muscles of the upper and lower limbs, but strength was intact distally in all limbs. (*Id*.).

In November 2012 Dr. LeClair noted that Palaghe had "some lower lumbar disc pathology," with lumbar spondylosis and facet syndrome. (Tr. 340). Physical therapy and injections were unhelpful. (*Id*.). Palaghe had a "strong desire to go back to work," but could no longer "sit for any prolonged time." (*Id*.). Palaghe also noted that Norco was effective for brief periods of time, but did not adequately control her pain over time. (*Id*.). Palaghe was "very weepy" and had bilateral weakness in her lower extremities;" straight leg test was negative bilaterally. (*Id*.).

Also in November 2012 Palaghe was discharged from physical therapy for failure to comply with her treatment regimen, having apparently attended only three of her thirteen scheduled visits. (Tr. 346).

In January 2013 Palaghe treated at Covenant hospital for right lower quadrant pain. (Tr. 312). A CT scan produced normal results. (Tr. 312). Dr. Paul LeClair noted that Palaghe's gait was normal, that she had pain on truncal rotation, and that she had "weakness . . . bilaterally in her lower extremities," but without reflex impairment. (Tr. 337).

A February 2012 MRI scan at the same hospital revealed normal vertebral body height, no intrinsic cord signal abnormality, a mild bulge at L2-L3 and L3-L4 with facet hypertrophy, but without significant canal narrowing, and with some stenosis. (Tr. 316). There was a diffuse bulge at L4-L5 along with an annular tear, with some neural foraminal narrowing. (*Id.*). Likewise, at L5-S1 there was a mild bulge without significant canal narrowing, but with mild left neural foraminal stenosis. (*Id.*).

A March 2013 scan of Palaghe's spine revealed no radiological evidence of sacroiliitis. (Tr. 328).

In April 2013 Dr. Paul LeClair prescribed pain-relieving Norco pills to be taken once every four fours, but was taking them more frequently. (Tr. 336). Palaghe was admonished to adhere to treatment recommendations regarding the frequency of her medication. (*Id.*). Dr. LeClair noted that Palaghe's back pain did not resolve with physical therapy or the use of epidural steroid shots. (Tr. 334). Palaghe was making use

of Norco and Fentanyl patches to relieve pain, but did not experience total relief. (*Id*.). Palaghe moved slowly and had some proximal weakness in the upper and lower limbs, along with distal weakness and myofascial pain with palpation. (*Id*.).

Also in April 2013 a radiological examination of Palaghe's back showed mild bilateral osteoarthritis, no periarticular erosions, and some osseous prominence along the lateral femoral head/neck junction. (Tr. 352). Also in April 2013, Dr. Sanjeev Prakash noted that Palaghe complained of seven out of ten pain, along with back stiffness for three hours each morning. (Tr. 388). He found that Palaghe experienced fibromyalgia. (*Id*.).

In June, July, and August 2013 Dr. Ray Mangulabnan found signs of chronic pain syndrome and lumbar disc degeneration at L4-L5. (Tr. 415, 418).

A July 2013 MRI of Palaghe's spine showed degeneration of the intervertebral disc and facet changes in the mid and lower spine, along with stable moderate right neural foraminal narrowing. (Tr. 353). Palaghe's pain was chronic and at eight out of ten intensity, the pain was exacerbated by activity, and she had difficulty sleeping, and occasional numbness in the upper extremities only. (Tr. 355). She had no evidence of spinal canal stenosis. (*Id*.). She did not tolerate use of either Morphine or Fentanyl patches for treatment of pain. (*Id*.). MRI evidence suggested L5-S1 facet hypertrophic changes and L4-L5 neuro foraminal stenosis. (Tr. 356).

A September 2013 MRI of Palaghe's spine showed mild bilateral multifocal neural foraminal stenosis without high grade spinal canal stenosis. (Tr. 435).

10

Palaghe treated again for back pain in November 2013, complaining of six out of ten pain, which she described as sharp and stabbing, and which she just could not "take . . . anymore." (Tr. 451). She had numbness in the left leg and upper thigh. (*Id*.). Review of an MRI showed mild bilateral multifocal neural foraminal stenosis, but without high grade spinal canal stenosis. (Tr. 453). She was again referred to the pain clinic. (*Id*.).

In November 2013 Palaghe reported ten out of ten pain. (Tr. 456). In December 2013 she again reported ten out of ten pain, describing it as constant, sharp, shooting pain. (Tr. 462). She had facet tenderness at L3-L5 along with waist pain on extension and flexion. (Tr. 464). Her muscle strength and tone was four to five out of five in both lower extremities. (Tr. 465). She did not appear to suffer any numbness. (*Id*.). A discogram was recommended. (Tr. 467). She returned to Dr. Mangulabnan that month for treatment of her back pain, and was prescribed fentanyl, Norco, and a discogram study. (Tr. 484).

Also in January 2014 Palaghe underwent a discogram to study her back maladies. (Tr. 501). Her preoperative diagnosis included low back pain and degenerative disc disease. (*Id*.). Her postoperative diagnosis duplicated those findings, in addition to a partial thickness annular tear at L4 through S1, and discogenic pain at L3-S1. (*Id*.).

In January 2014 Palaghe complained of constant low back pain that was severe and prevented her from keeping up with her daily activities. (Tr. 494). The pain sometimes radiated downward into her legs. (Tr. 494-95). She had some issues with urgency, frequency, and incontinence of bladder. (Tr. 495). She had no cervical or thoracic spinal tenderness and no facet tenderness, but had spinous process tenderness at

L3-S1, but with a limited range of motion in the lumbar spine with pain on movement. (Tr. 496). Straight leg raise was negative, and strength in the lower extremities was normal. (*Id*.). Her deep tendon reflexes in the lower extremities were normal. (*Id*.). Babinski's and Romberg's signs were negative. (*Id*.). Her discogram was positive at L3 through S1. (Tr. 497). Surgery was recommended. (*Id*.).

A late January 2014 MRI showed signs of an annular tear at the disk at level L4-L5, partially extending to the right side, along with herniation of the disc. (Tr. 525).

In February 2012 Palaghe showed no musculoskeletal tenderness or edema. (Tr. 561). She also complained of bilateral leg pain and weakness, and issues with urgency and frequency of urination. (Tr. 630). She was diagnosed with lumbar disc herniation with radiculopathy, spinal stenosis without neurogenic claudication, retrolisthesis, and low back pain. (Tr. 632). She had nine out of ten pain. (Tr. 634).

In March 2014 Palaghe complained of nine out of ten pain in her lower back. (Tr. 626).

On April 9, 2014, Palaghe underwent a posterior lumbar interbody fusion at L3-L4. (Tr. 594, 719). Elsewhere the operation is described as a "[l]umbar decompressive laminectomy of L3 and L4 with media facetectomies and foraminotomies for decompression" and "[d]iskectomy of L3-4 for decompression." (Tr. 602). Her admission diagnosis was degenerative disc disease at L3-L4, and her discharge diagnosis reflected lumbosacral radiculopathy at L3. (*Id*.). Her lower extremity strength was normal, and her deep tendon reflexes in the bilateral knees and ankles were normal. (Tr. 595). Straight leg

raise test continued to be negative. (*Id*.). The procedure was completed without complication. (Tr. 598). Her post-operative diagnostic consultation reflected lumbosacral radiculopathy at L3-L4. (Tr. 599). Her short term goals included achieving bed mobility, walking 150 feet with a rolling walker, and being able to move up and down two steps with the use of a rail. (Tr. 718).

In late April 2014, Palaghe again complained of eight out of ten pain in the lower back. (Tr. 620). She was told that "it will take time to recover from back surgery and the pain should become less as time goes on." (Tr. 621). She complained during another treatment session that her pain post-spinal fusion was uncontrollable. (Tr. 639). Her gait and stance were abnormal, favoring the left side. (Tr. 640).

A June 2014 x-ray of Palaghe's spine showed that the fusion screws and intradiskal prosthesis was in satisfactory position at L3-L4. (Tr. 711). However, Palaghe's spine also had signs of degenerative disk space narrowing at L2-L3 and degenerative hypertrophic facet changes at L4 through S1. (*Id*.). She did not have subluxation, but had minimal levoconvex scoliosis in the mid-lumbar spine. (*Id*.). She complained that her pain was out of control, and was upset that she had been discharged from physical therapy due to cancelling appointments without advance notice. (Tr. 735, 737). Palaghe was warned, as she was numerous times in the record, that her practice of smoking one pack of cigarettes daily was impeding her healing. (Tr. 743). Also in June 2014, Palaghe described her pain as ranging from four to five out of ten with medication. (Tr. 746).

13

In July 2014 Palaghe complained of back pain and requested a different medication. (Tr. 681). Her physical rehabilitation potential was "good." (Tr. 705). She complained of pain again in November 2014, but was in no apparent distress. (Tr. 686-87).

In August 2014 Palaghe's physical therapist wrote that she was "independently with all activities" prior to her surgery, but was then limited in terms of bending, carrying, dressing, driving, lifting, rolling over, and could only sit for two hours, sleep for four hours, stand ten minutes, and walk five minutes. (Tr. 707).

An October 2014 physical therapy write-up reflects that her lumbar mobility was not improved by surgery, but that she had only pursued one therapy session due to "fear of returning to therapy." (Tr. 692). She had no increase in pain upon stretching or post-treatment. (*Id*.). As the result of her surgical incision she experienced weakness, pain, and altered mechanics, which limited her ability to stand, walk, and move while laying. (*Id*.). It was also found that her "limited tolerance to weight bearing" prevented her from working. (*Id*.). Palaghe skipped eight treatment sessions, and had "slow and inconsistent" progress. (Tr. 697). She was later discharged from therapy having failed to attend ten sessions, and having only attended two sessions. (Tr. 698). She expressed no improvement in mobility or pain. (Tr. 700).

Later in October 2014 Palaghe continued to complain of low back pain, and noted that she derived "no benefit" from physical therapy. (Tr. 706). She reported tripping over

her dog and experiencing some increased knee pain. (*Id.*). She again reported pain at eight out of ten, which radiated into her thigh and hip. (*Id.*).

Also in October 2014 Dr. Sultan Bhimani evaluated Palaghe's post-surgery condition, finding that her distal cord, including cauda equine, was within normal limits; the height of her disk spaces were maintained; bone marrow was normal; the alignment of her lumbosacral spine was within normal limits. (Tr. 727-28). Disk space at L2-L3 and L5-S1 was intact, as were the thecal sac, and neural foramina. (*Id.*). There was some sign of soft tissue abnormality at L3-L4 in the posterior aspect of the thecal sac, and a small annular tear at the periphery of the disk at L4-L5. (*Id.*).

Later that month, Palaghe reported "unbearable" pain at a rate of ten out of ten. (Tr. 730). She described her pain as constant, radiating, stabbing, sharp, and aching. (*Id.*). She was positive for urgency and frequency of urination, and suffered from myalgias. (*Id.*).

In November 2014 Palaghe presented with "extreme" lower back pain and lower left extremity pain. (Tr. 751). She reported that the pain did not improve post-surgery, but rather got worse. (*Id.*). The pain was constant, but was exacerbated by movement; she experienced lower extremity weakness. (*Id.*). She showed spinous process tenderness at L4-S1, she was positive for left and right facet loading sign, paraspinal myofascial tenderness on the right, her sacroiliac joints were non-tender, and she experienced pain at the waist with extension and flexion. (Tr. 753). Her gait was antalgic, and she showed reduced muscle strength and tone in the left and right lower leg and thigh. (*Id.*). Her

15

sensation was normal, but her deep tendon reflexes were substantially reduced in the Achilles tendon. (Tr. 754). She denied any incontinence. (Tr. 755). Palaghe was offered an epidural steroid injection to relieve pain, which was to be scheduled "ASAP!!!." (*Id*.).

### 3.    Application Reports and Administrative Hearing

### a.    Palaghe's Function Report

Palaghe completed a function report in August 2013, in which she asserted that her back pain prevented her from working. (Tr. 186). Palaghe reported that her activities of daily living included cleaning up "what [she] can" around the house, and lying down for "much of the day." (Tr. 187). She helped to take care of her husband, son, and pets to some degree, though she could not walk or clean up after her pets. (*Id*.). She attested to waking up several times nightly due to pain. (*Id*.). In terms of personal care, she found it necessary to sit down while dressing, found it hard to shave, wrote that she experienced no problems with feeding herself or using the toilet, but also wrote that "[i]t's hard to do anything because of severe back pain," and that she "hate[s] living like this." (*Id*.). She required no reminders to take medicine or perform personal care. (Tr. 188).

In terms of meals, she prepared frozen dinners, sandwiches, and used a crock pot. (Tr. 188). She was unable to make big dinners or use the oven due to difficulty bending. (*Id*.). As to chores, she dusted, used the dishwasher, and did laundry, but needed help moving clothing upstairs. (*Id*.). She reported going outside "hardly ever," because she was unable to go for walks, ride a bike, or perform yard work. (Tr. 189). She could drive, but usually had her son drive her around, and had no problems going outside alone. (*Id*.).

16

She went shopping weekly for an hour, but her son moved groceries indoors for her. (*Id.*). Her hobbies included only watching television; she spoke with her mother by phone and spent time with her husband and son; she attended church weekly. (Tr. 190).

Palaghe reported some problems getting along with others because her pain put her in a bad mood which she took out on her family. (Tr. 191). She did not partake in social activities beyond those listed above. (*Id.*). She reported being able to walk only a short distance, could not lift more than five pounds, and had difficulty removing caps from bottles. (*Id.*). She reported being able to walk to the end of the driveway and back, but required a fifteen minute rest thereafter. (*Id.*). She could follow instructions without issue, had no problems with stress, got along with authority figures, but did not like change. (Tr. 191-92). She did not use an assistive device to walk. (Tr. 192).

In the "remarks" section of the function report, Palaghe wrote that she has "seen so many doctors and they all say is [sic] the clinical findings do not support my pain. I am not making up this pain. I want my old life back." (Tr. 193). She also wrote that one physician told her that the "fourth disc should come out but [he] would not put it in writing. No one will help me except to feed me pills." (*Id.*).

### b.    Palaghe's Testimony at the Administrative Hearing

At the December 2, 2014, hearing before the ALJ, Palaghe testified that she last worked in July 2013 as a receptionist, and prior to that worked as a medical biller. (Tr. 65). Her medical biller job required her to ambulate around the office and lift up to ten pounds of weight. (Tr. 67). She stopped working as a medical biller in 2012 because she

was "let go" due to severe back pain which caused her to miss many days of work. (Tr. 68). She testified that her pain had increased since her spinal fusion in April 2014. (*Id*.). Between 2012 and her surgery, she experienced pain at a rate of nine out of ten. (Tr. 69). The ALJ then inquired as to whether the pain had increased from that period, and Palaghe acknowledged that it was "basically about the same," and that she "just [did not] feel that the surgery helped." (*Id*.).

In 2012 she could walk less than half a block, due to leg pain, back pain, and leg weakness. (Tr. 70). She guessed that she could stand for about ten minutes at that time. (*Id*.). Likewise, she could sit for about fifteen minutes in 2012 before finding it necessary to change position. (*Id*.). She seemed to indicate, though somewhat unclearly, that these limitations persisted post-surgery as well. (*Id*.). Similarly, in 2012 she would lay down for four to five hours daily, forty-five minutes at a time. (Tr. 71). Again, she said that her need to lie down had not changed post-surgery. (Tr. 72).

Palaghe stated that she "did not" perform any chores, but also attested that she folded laundry, did "very little" cooking on the stove or microwave only, and went to the grocery store. (Tr. 72).

Palaghe stated that she recently began taking Wellbutrin for treatment of depression. (Tr. 74). She attested to "cry[ing] all the time," and forcing herself to eat. (*Id*.). She also took Xanax for treatment of anxiety. (Tr. 78).

She did not continue physical therapy because "in the evening, the pain got so excruciating, [she] was just shaking and crying and [she] was scared to go back." (Tr.

18

75). As to the origin of her pain, Palaghe acknowledged that she did not have an acute trauma which could have caused her back injury, but that it developed over time due to an unknown cause. (*Id.*).

### c.      The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine Palaghe's ability to perform work. The ALJ first asked the VE to characterize Palaghe's past relevant work. (Tr. 43-44). The VE found that Palaghe's past relevant work as both a medical biller and medical receptionist was semi-skilled work performed at the light level of exertion. (Tr. 81).

The ALJ asked the VE to assume a hypothetical individual who was limited to light work; but who could occasionally climb stairs, ladders, and scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; who was limited to performing simple, routine and repetitive tasks at non-production rate pace; could interact with the public occasionally; and who was limited to simple work-related decisions. (Tr. 81-82). The VE found that such a worker could not perform Palaghe's past relevant work. (Tr. 82). However, the VE found that such a worker could work as a machine tender (101,000 jobs nationally) or packager (122,000 jobs). (*Id.*).

In a second hypothetical, the ALJ asked the VE to imagine the same restrictions as before, but to add that the individual world be limited to sedentary work, and would require four unscheduled breaks per shift, during which she can recline. (Tr. 82). The VE

19

testified that such a worker could not perform work available in substantial numbers nationally.

Finally, the ALJ asked whether an individual with the restrictions in the first hypothetical, but who would be off task twenty percent of the workday, would be able to perform work available in substantial numbers nationally. (Tr. 83). The VE found that these restrictions would also be work-preclusive. (*Id.*).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both    "acceptable"    and    non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the

20

definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a

21

person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r*

22

*of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any
       medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . .
pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

Palaghe argues that the ALJ erred by 1) Failing to find that the meets or equals Listing 1.04A, and 2) Erroneously discounting her claims of disabling pain. (Doc. 12 at 15-20). Palaghe also briefly mentions a possible claim that her conditions met or equaled Listings 12.04 or 12.06, but this underdeveloped argument is waived for the reasons stated below.

### 1.    The ALJ Did Not Err by Finding that Palaghe Did Not Meet or Equal Listing 1.04

Claimants with severe impairments that meet or equal a listing in the Appendix are deemed disabled without further analysis. 20 C.F.R. § 404.1520(a)(4)(iii). Fitting a claimant into a listing is dispositive and thus demands a higher level of proof: listed impairments preclude any gainful activity, not just substantial gainful activity. *See Sullivan v. Zebley*, 493 U.S. 521, 525 (1990); 20 C.F.R. pt. 404, subpt. P, App. 1. Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c). A claimant must satisfy all of the criteria to meet the listing. *Id. See also Zebley*, 493 U.S. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). Alternatively, medical equivalence of a Listing can occur in three situations where the claimant fails to meet all of the criteria:

> (1) the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria; (2) the claimant has a non-listed impairment that is at least of equal medical significance" to a listed

25

> impairment; or (3) the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 n.2 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1526). The ALJ retains discretion at this stage, and does not need to attach "any special significance to the source of a[] [medical] opinion . . . [regarding] whether an impairment meets or equals a listing." 20 C.F.R. § 404.1527(d)(3). This is particularly true for the first part of the analysis: "'[A]n ALJ is capable of reviewing records to determine whether a claimant's ailments *meet* the Listings . . . .'" *Stratton v. Astrue*, 987 F. Supp.2d 135, 148 (D. N.H. 2012) (quoting *Galloway v. Astrue*, No. H-07-01646, 2008 WL 8053508, at *5 (S.D. Tex. May 23, 2008)). The Commissioner, however, has qualified the ALJ's discretion to decide equivalence, noting that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6p, 1996 WL 374180, at *3.

"When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Social Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004) (citation omitted). Consequently, an ALJ's Listing analysis must be viewed in light of the evidence the claimant presents.

26

Listing 1.04 can be met in three ways: with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04. Nerve root compression must be accompanied with limited spinal movement, motor and sensory or reflex loss, and positive straight-leg raising tests, both sitting and supine, if the lower back is involved. *Id.* Spinal arachnoiditis must be confirmed by surgery notes, tissue biopsies, or medical imaging. *Id.* Finally, lumbar spinal stenosis is established by imaging studies, "chronic nonradicular pain and weakness," and "inability to ambulate effectively . . . ." *Id.* "Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* § 1.00(B)(2)(b). An individual meets this condition when, for example, they need two crutches or canes, cannot walk without a walker, cannot travel alone, cannot use public transportation, or cannot walk. *Id.*

In this case, the ALJ did not make use of a medical expert at the hearing. None of Palaghe's physicians opined as to whether she met Listing 1.04. The ALJ does not reference any physician's opinion at Step Three, but rather concludes that Palaghe does not meet that listing because her record does not demonstrate

> compromise of a nerve root . . . or the spinal cord with additional findings of: A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and positive straight-les raising or; B. Spinal arachnoiditis or; C. Lumbar spinal stenosis resulting in pseudoclaudication.

(Tr. 38). At Step Four, the ALJ gives "great weight" to the opinion of state agency physician Dr. Edward Brophy, who determined on January 27, 2014 that Palaghe was not disabled by physical ailments. (Tr. 95-96). When it is properly referenced and supported by analysis in the decision, a non-examining stage agency physician's finding that a claimant does not equal a listing can satisfy the ALJ's duty to consider equivalence. *See Hayes v. Comm'r of Soc. Sec.*, No. 11-14596, 2013 WL 766180, at *9 (E.D. Mich. Feb. 4, 2013), report and recommendation adopted, No. 11-14596-DT, 2013 WL 773017 (E.D. Mich. Feb. 28, 2013). Here, the ALJ wholly adopts Dr. Brophy's opinion, including the conclusion that Palaghe can perform work at the light level. (Tr. 47). Yet Dr. Brophy does not specifically opine that Palaghe does not meet or equal a listing. Courts in this circuit have remanded under similar circumstances. *See Blevins v. Astrue*, No. CIV.A. 08-244-GWU, 2009 WL 1636151, at *4 (E.D. Ky. June 10, 2009) ("No medical adviser was called to testify, and no state agency physician reviewed all of the evidence in order to determine whether the plaintiff met or equaled a Listing. Therefore, a remand will be required for further consideration of the applicability of the Listing."). Because the Court finds other, clearer justifications for remand, I decline to find that this anomaly merits remand.

Where, as here, a claimant is unrepresented by counsel, the ALJ's "duty to develop a full and fair administrative record is heightened—although it does not remove

28

the burden of proof from the claimant." *Strang v. Comm'r of Soc. Sec.*, 611 F. App'x 271, 276 (6th Cir. 2015). As always, ALJ must provide sufficient articulation of his or her findings to permit meaningful review. *Reynolds*, 424 Fed. Appx. at 416; *Woodall v. Colvin*, No. 5:12cv1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug. 29, 2013) ("[T]he ALJ must build an accurate and logical bridge between the evidence and his conclusion.").

The ALJ summarizes large tracts of the medical record, making special note of the repeated findings that Palaghe's muscle strength was "5/5 throughout," that her straight leg raise tests were negative, that she had normal range of motion in the spine, that her gait was normal, that she had little to no tenderness in the spine, that she had only intermittent radiating pain in the legs, and that her sensation was intact throughout. (Tr. 42-46).

The ALJ's recitation of the medical evidence fails to highlight those portions of the record which oppose her conclusion, including findings of bilateral lower extremity pain resulting from herniated nuclear pulposes at L4-L5 in December 2011 (Tr. 429), bilateral leg pain and weakness in addition to spinal stenosis in February 2012 (Tr. 630), positive straight leg raise in March 2012 (Tr. 267), facet joint disease (*Id*.), severe pain upon even ten degrees of extension in the spine (Tr. 281), "very significant facet joint arthropathy" in June 2012 (Tr. 280), proximal weakness in all limbs in August 2012 (Tr.

29

344), bilateral weakness in the lower extremities in November 2012 (Tr. 340), bilateral leg weakness in January 2013 (Tr. 337), "some stenosis" in February 2012 (Tr. 316), weakness in the legs along with myofascial pain upon palpation in April 2013 (Tr. 334), lumbar disc degeneration at L4-L5 in August 2013 (Tr. 418), evidence of neuro foraminal stenosis and hypertrophic changes in July 2013 (Tr. 356), numbness in the legs in November 2013 (Tr. 453), degenerative disc disease in January 2014 (Tr. 501), limited range of movement in the lumbar spine along with spinous process tenderness (Tr. 496), an annular tear (Tr. 525), degenerative disc space in June 2014 along with degenerative hypertrophic facet changes (Tr. 711), weakness, pain, and difficulty ambulating in October 2014 (Tr. 692), along with lower extremity weakness in November 2014 (Tr. 753), and reduced Achilles tendon reflexes (Tr. 754). As Palaghe points out, the ALJ also seems to ignore that the nature of her April 2014 surgery, a decompressive laminectomy, was performed for the purpose of reducing pressure on the nerve root.

Looking again to Listing 1.04A, it is clear that Palaghe suffers from several of the spinal conditions enumerated by that provision, including herniated nucleus pulposes, stenosis, and facet arthrosis which compromised the nerve root, necessitating surgical intervention to relieve pressure on the nerve. Palaghe also suffers from neuro-anatomic distribution of pain (*i.e.* pain along the spinal nerve), limitation of the motion of her

30

spine, and some motor, reflex, and sensory loss. Listing 1.04A requires proof of the following conditions:

1. A disorder of the spine, including but not limited to "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture," **and**
2. "Compromise of a nerve root (including the cauda equina) or the spinal cord," **and**
3. "Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness)," **and**
4. "Sensory or reflex loss," **and if there is involvement of the lower back**,
5. "Positive straight-leg raising test" in both the sitting and supine position.

Where a claimant alleges that she meets Listing 1.04A by way of a lower back injury, she must meet all five criteria included in that listing.

Where a claimant alleges disability involving the low back, Listing 1.04A is not satisfied unless there is also evidence of positive straight-leg raising tests in both the sitting and supine position. Palaghe's complaints of back pain are focused on her lower back, thus she must also show that she meets this criteria. (*See, e.g.*, Tr. 626).

Palaghe makes no effort to demonstrate that she meets the straight-leg raise test requirement in both the supine and sitting position. Indeed, she cannot meet this requirement. Only once in the record, in March 2012, did Palaghe show a positive result on the straight-leg raise test, with no indication as to whether it was performed in the sitting or supine position. (Tr. 267). Lack of evidence that the straight-leg test was

positive in both the sitting and supine position is itself sufficient to preclude a claimant from meeting Listing 1.04A. *See Richardson v. Colvin*, No. 2:14-CV-13354, 2015 WL 4772399, at \*23 (S.D. W. Va. May 18, 2015), report and recommendation adopted, No. CIV.A. 2:14-13354, 2015 WL 4772412 (S.D. W. Va. Aug. 12, 2015), *Harris v. Colvin*, No. 3:14cv90, 2015 WL 1259403, at \*15 (E.D. Va. Mar. 18, 2015); *Page v. Astrue*, No. 1:12–cv–3367–WSD, 2014 WL 988825, at \*12 (N.D. Ga. Mar. 12, 2014); *Nieves v. Astrue*, No. EP–12–CV–069–RFC, 2013 WL 1192013, at \*7 (W.D. Tex. Mar. 21, 2013). All subsequent straight-leg raise tests showed negative results, including those performed both before and after her April 2014 surgery. (Tr. 344, 496, 506-07, 508, 595). While Palaghe arguably meets the first four criteria of Listing 1.04A, she simply cannot meet the straight-leg raise requirement. Because claimants must meet *all* of the medical criteria of a listing to qualify, Palaghe does not meet Listing 1.04. *Zebley*, 493 U.S. at 530.

## 2. *The ALJ's Credibility Assessment is Not Supported by Substantial Evidence*

Palaghe next argues that the ALJ erroneously discounted her complaints of disabling pain. (Doc. 12 at 18-19). She notes that she was fired from her largely sedentary job as a medical biller after missing an excessive number of days due to back pain, that her pain interrupted sleep, that she laid down four to five hours per day, that she performs

32

few chores, and that objective evidence comported with her allegations of extreme pain. (*Id*.).

As noted above, the record is replete with consistent complaints of severe back pain, and the most recent, post-surgery, records indicate that Palaghe's pain has not abated. As the ALJ properly recognizes, Palaghe's asserted activities of daily living are quite restrictive, including attending church, watching television, using the telephone, performing short shopping trips, folding laundry, and using the dishwasher. (Tr. 189-90). Finding no substantial inconsistency amongst Palaghe's claimed pain and limitations, the ALJ relies upon the Palaghe's medical and work record to discredit her assertions.

The ALJ also notes that Palaghe performed some work following her alleged onset date, and collected unemployment while applying for disability benefits. (Tr. 47). Indeed, an application for disability benefits concurrent with seeking unemployment benefits has some deleterious effect on a claimant's credibility. *See Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801 (6th Cir. 2004) ("Applications for unemployment and disability benefits are inherently inconsistent."); 20 C.F.R. § 404.1571 ("[e]ven if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did . . . ."). However, Palaghe's assertion that she attempted to work following her alleged onset date, but was fired after one week because she was unable to complete the work due to back pain, tends to support rather than undercut her

allegation of disabling pain. (Tr. 47, 65). *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 789 (6th Cir. 2009) ("White's extensive work history and attempts to continue working despite his disability support his credibility . . . .").

The ALJ references records indicating that Palaghe was not compliant with her physical therapy regimens, and was discharged from physical therapy for failure to attend appointments and repeatedly cancelling appointments on the day of treatment. (Tr. 46, 295, 346, 698, 735). While this would generally provide some reason to doubt the veracity of Palaghe's complaints of pain, she adequately explains her failure to pursue physical therapy. She noted at the hearing that she was in too much pain to attend therapy, an assertion consistent with her repeated, continuing, and worsening complaints of pain. (Tr. 75). The medical records indicate as early as December 2011 that Palaghe's pain was too severe to be adequately managed by physical therapy (Tr. 429), that physical therapy was unhelpful in November 2012 (Tr. 340), nor was it helpful even in combination with epidural steroids in April 2013 (Tr. 336), and in October 2014 she experienced no benefit from physical therapy (Tr. 706).

The ALJ also notes Palaghe's penchant for smoking, despite being informed that it would impede her healing following her spine surgery. (Tr. 46). Palaghe's failure to cease smoking offers, at best, weak evidence impugning her credibility. Palaghe's spine maladies were not caused by smoking, and no physician opined that the inefficacy of her

34

spine surgery was the result of her smoking. As to smoking, the Sixth Circuit has held that "when a claimant's lifestyle contributes to his symptoms, and he is not truly disabled, he is not entitled to disability benefits." *Russell v. Sec'y of Health & Human Servs.*, 921 F.2d 277 (6th Cir. 1990). Yet in this case there is no evidence that Palaghe's smoking contributed to her symptoms. Further, Palaghe's allegedly disabling symptoms square up with the objective medical evidence, thus she does appear to be "truly disabled," and *Russell* does not bar her claim to benefits.

Perhaps most distressingly, the ALJ's recitation of the medical evidence totally ignores that Palaghe not only complained of persisting pain post-surgery, but asserted that her pain actually intensified. The ALJ notes that Palaghe's gait was straighter, her strength and reflexes were normal, she denied fatigue and weakness, her straight les raise test was negative, she had no balance issues, and her extremities were "functional." (Tr. 43-44). Totally absent from this review of the evidence are the highly relevant notes that Palaghe was more limited in terms of ambulation in August 2014 than she was prior to surgery, that she had limited tolerance to weight bearing (Tr. 692), that she experienced unbearable, ten out of ten pain in October 2014 (Tr. 730), and that she had "extreme" lower back and lower left extremity pain in November 2014 (Tr. 751). Where Palaghe's pre-surgery medical record supports a finding that she experienced extreme pain and was highly limited in her activities of daily living, and her post-surgery record suggests that

35

her symptoms exacerbated, it is difficult to see how the credibility of her symptoms can be impugned.

Likewise, the ALJ's finding that treatments for Palaghe's pain have "been generally successful in controlling those symptoms" is plainly contradicted by the record. In December 2011 it was recorded that Palaghe's pain was somewhat ameliorated by medications, ice, and heat (Tr. 429), in November 2012 she reported that Norco controlled her pain for brief periods of time (Tr. 340), and in April 2013 Palaghe reported that the joint use of Norco and Fentanyl patches provided some relief (Tr. 334).

These modest improvements are dominated by repeated complaints of extreme pain which pervade nearly all of Palaghe's treatment sessions. She treated with a pain clinic as early as December 2011, reporting seven out of ten pain (Tr. 429), eight out of ten in March 2012 (Tr. 252), only four out of ten in May 2012 (Tr. 272), was "very weepy" due to her pain in November 2012 (Tr. 340), was taking narcotic pain medication on a greater-than-prescribed basis and reported that her back pain did not resolve with use of physical therapy and epidural steroids in April 2013 (Tr. 336), seven out of ten pain in April 2013 (Tr. 352), eight out of ten in July 2013 (Tr. 355), six out of ten in November 2013 (Tr. 451), ten out of the pain in November 2013 (Tr. 456), eight out of ten pain in April 2014 (Tr. 620), uncontrolled pain following her back surgery (Tr. 640), eight out of ten pain in October 2014 (Tr. 706), "unbearable" pain in October 2014 (Tr. 730), and

36

"extreme" pain in November 2014 (Tr. 751). This is not a record of generally successful treatment of pain, but a failed battle in which the use of narcotics, steroid injections, physical therapy, and surgery were insufficient to tame extreme spinal suffering.

Finally, the ALJ's conclusion that Palaghe's treatment was "essentially routine and conservative in nature at times" is both hollow and false. (Tr. 44). Palaghe underwent surgical spinal repair, a non-conservative therapy if ever there was one. *See Sanchez v. Colvin*, 2013 WL 1319667, at *4 (C.D. Cal. March 29, 2013) ("Surgery is not conservative treatment"). With the exception of a claimant who is unfortunate to undergo surgeries at frequent intervals, all treatment is "conservative in nature at times."

In sum, the ALJ's credibility finding draws some support from her note that Palaghe applied for unemployment and disability benefits simultaneously, and from the finding that Palaghe did not consistently attend physical therapy appointments. Her credibility finding draws minimal support from Palaghe's continuing smoking habit. Yet Palaghe's asserted activities of daily living are wholly consistent with her allegedly disabling symptoms, and review of the objective medical evidence shows consistent reports of severe pain. The ALJ's finding that treatment of Palaghe's pain has been "generally successful" is simply a misreading of the record, which shows largely uncontrolled, worsening pain. Likewise, the ALJ's assertion that Palaghe's course of treatment has been "conservative" ignores the surgery she underwent. The ALJ's

37

recitation of the objective medical evidence is also highly selective, and ignores many records which substantially corroborate Palaghe's claims of disabling pain.

While the Court recognizes that credibility findings are normally the province of the ALJ and can only be disturbed for a "compelling reason" *Sims*, 2011 WL 180789, at *4, I find that the ALJ's credibility finding here draws only minimal support from the reasons listed by the ALJ, and is clearly contradicted by the record. Consequently, the matter must be remanded.

### 3. The ALJ's Finding that Palaghe Was Not Disabled by Mental Impairments is Supported by Substantial Evidence

Finally, Palaghe's brief makes some cursory references to her mental health. In her recitation of the facts, she notes that the ALJ

> concluded that the existence of the claimant's depression, anxiety, was objectively confirmed, however, that the medical evidence of record does not support the conclusion that she experiences such at a level severe enough to meet any of the above listings' criteria. In doing so, the ALJ attempts to circumvent the Opinions of treating social workers/psychologists who found, for example, that the Claimant was functioning at a GAF of only 40.

(Doc. 12 at 4). Several pages later, she notes a finding that she was "clearly very depressed." (Doc. 12 at 8). In the heading of her argument section, she briefly notes that she "met or equaled the requirements of listing . . . 12.04 and/or 12.06," listings which both address mental health. (*Id*. at 12). Palaghe makes no effort to develop this argument,

38

but rather merely concludes in her relief section that her argument that she meets Listing 1.04 "is supplemented by very strong indicia of Plaintiff meeting and/or equaling substantial parts of Listings 12.04 and/or 12.06." (*Id.* at 20).

It is well settled that where a Social Security claimant makes arguments which are "adverted to in only a perfunctory manner," those arguments "are waived." *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013). *See also Aarti Hospitality, L.L.C. v. City of Grove City, Ohio*, 350 F. App'x 1, 11 (6th Cir. 2009) ("After setting forth the applicable law on their due process claim, plaintiffs devote one sentence in their appellate brief to 'arguing' why the district court's judgment should be reversed.... Accordingly, we deem plaintiffs' appeal of their due process claim forfeited."); *Fielder v. Comm'r of Soc. Sec.*, No. 1310325, 2014 WL 1207865, at *2 (E.D. Mich. Mar. 24, 2014) (holding that claim on appeal from ALJ's decision was waived because plaintiff referred to it in a perfunctory manner).

Palaghe's underdeveloped argument cannot support a claim for relief, but rather are waived. Palaghe makes no effort whatsoever to discuss the criteria necessary to meet listings 12.04 or 12.06, and points to no specific findings in the record which could support a conclusion that she met or equaled those listings. By failing to develop her argument as to Listings 12.04 and 12.06, Palaghe has waived them. *See Lear v. Astrue*, No. CIV.A.4:08CV00077EHJ, 2009 WL 928371, at *3 (W.D. Ky. Apr. 3, 2009) ("In

39

fact, plaintiff has not even identified a listing or listings in Appendix 1 that she believes she meets or medically equals . . . . Under the circumstances, the undersigned will deem the matter waived."); *see also Ellis v. Comm'r of Soc. Sec.*, No. 3:14-CV-02336, 2015 WL 6444319, at *13 (N.D. Ohio Oct. 23, 2015) ("Without reference to case law or regulations supporting Plaintiff's assertions, this Court cannot properly determine whether or not Plaintiff's argument regarding Listings 1.02 or 1.04 has any merit. As a result of failing to explain, develop, or provide an analytical framework for this assigned error, Plaintiff has waived any argument on this point.").

Palaghe also makes a weak effort to resuscitate her mental health claim in her reply brief, noting that "Defendant never addressed the severe depression that the Plaintiff endured as a result of the longstanding pain and dysfunction of her back." (Doc. 14 at 7). Reserving this argument for her reply brief denies the Commissioner an opportunity to respond, and thus cannot save her claim. *See Paul v. Henri–Line Mach. Tools, Inc.*, No. 10–10832, 2012 WL 6642494, at *6 (E.D. Mich. Dec.20, 2012) ("A reply is not the proper place to raise an argument for the first time."). In any case, Palaghe still fails to specifically discuss the requirements of Listings 12.04 and 12.06 in her reply brief, thus her argument would remain waived even if she had incorporated her reply brief into her opening brief.

### 4. *Remand for Benefits is Appropriate*

40

Once it has been determined that the Commissioner's administrative decisions are not supported by substantial evidence, a district court faces a choice. It may either remand the case to the Commissioner for further proceedings or direct the Commissioner to award benefits. The court may reverse and direct an award of benefits if "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits . . . where the proof of disability is overwhelming or where proof of disability is strong and evidence to the contrary is lacking." *Felisky*, 35 F.3d at 1041; accord, *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir.1994). This comports with the principle that "where remand would be an idle and useless formality, courts are not required to convert judicial review of agency action into a ping-pong game." *Wilson v. Comm'r of Soc. Sec.*, 378 F3d 541, 547 (6th Cir.2004) (citations omitted).

In this case, the Court finds that the ALJ's credibility finding is not supported by substantial evidence because Palaghe's medical record well supports her allegations of disabling back pain. Upon review of the records, the Court finds that proof of Palaghe's disability is overwhelming, thus remand for benefits is appropriate.

## H.    Conclusion

I find that the ALJ's decision, which ultimately became the final decision of the Commissioner, is not supported by substantial evidence. The ALJ properly found that

41

Palaghe does not meet Listing 1.04, and Palaghe has waived any argument relating to mental health by failing to develop it in a more than perfunctory manner. Nevertheless, Palaghe's complaints of disabling pain are well supported by the record, and remand for benefits is appropriate.

### I.    Order

In light of the above findings, **IT IS ORDERED** that Palaghe's motion for summary judgment (Doc. 12) is **GRANTED**, the Commissioner's motion for summary judgment (Doc. 13) is **DENIED**, and this case is **REMANDED** for benefits to be awarded consistent with this Order.

**IT IS SO ORDERED**.

Date:  April 28, 2016                           S/ PATRICIA T. MORRIS
                                                Patricia T. Morris
                                                United States Magistrate Judge


### CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: April 28, 2016                            By s/Kristen Krawczyk
                                                Case Manager

42